The District Court struck three unfairly hard blows against Bard and his trust. First, by excluding Bard's compliance with FDA safety regulations and the FDA's clearance of the Evolta Plus to be lawfully sold on the market. The Court compounded the prejudice in that ruling by allowing the introduction of the Rank Hearsay Material Safety Data Sheet, the MSDS, from which Bard's surgical mesh was manufactured, so that even though Bard did everything the FDA required it to do, plaintiffs were able to portray us as essentially running a rogue operation in manufacturing the Evolta Plus product, which in actuality was lawfully on the market after FDA review and clearance. And then the third blow was in refusing to instruct the jury in accordance with Georgia law that a design defect case requires proof by expert testimony, so that the plaintiff, having succeeded in keeping the jury from knowing that Bard was lawfully manufacturing the Evolta Plus, was able to argue to the jury that the MSDS standing alone was sufficient to establish Bard's liability, regardless of how the jury resolved the conflicts in the expert testimony. The combined effect of these errors was to make a fair trial for Bard a complete impossibility. Our first point is the exclusion of the 510K clearance process. The District Court refused to allow Bard to prove that the Evolta Plus was legally on the market pursuant to the FDA's 510K clearance process, which is the only process by which Bard could have sought to market its surgical mesh product under the CFRs adopted by the FDA. It is a Class II product and can only be marketed through the 510K process. That process is more of an assessment of equivalency. What does it really tell us about safety? It is equivalency for the purposes of determining safety and effectiveness. So, you know, at best, I don't necessarily disagree that it may have some marginal relevance with respect to safety, but how is it an abuse of discretion for the District Court in this case to have decided that even if it had some marginal relevance, it just wasn't worth the effort under 403 with respect to the jury's consideration of it? Judge, let me answer that at the back end first. There was no 403 balancing here, because it was a District Court rule that had zero probative value. It had no probative value. Well, but then even assuming that it did have probative value, I recognize that he gave it short shrift, but he did at least mouth the words, even if we assume that it has some minimal probative value, here's why I want to keep it out. That's well within the District Court's bailiwick. But in weighing 403, the Court has to assume it has probative value, or there's nothing to balance, and the Court simply did not do that. And the second part is the supposed balancing on the other side was that it would confuse the jury, and it would lead to a mini trial, and all that sort of thing. But, Judge, you have to realize what that means, is that in every case in which there's been FDA clearance, and a manufacturer has complied with the only process by which a Class II device can lawfully be marketed, all the plaintiff has to do is stand up and say, I'm going to try to prove it's not about safety and effectiveness, and that's the end, because that's basically what the judge had before him when he ruled, was the plaintiff saying, we don't believe this is about safety and effectiveness, and we want to show that to the jury. And then the final piece here. Isn't it true, though, in the 510K process, as I understand it, all you're showing is that there are previous devices on the market, and that this is not substantially different from those? for the purpose of evaluating the safety and effectiveness of the device. This is from the Joint Appendix at page 662. This is the supposed real quick driver's license process that the FDA has to go through and went through in approving our device. Part of the confusion is, and we have to go back to law for the source of this confusion, of course it's only a preemption case, it has nothing to do with the admissibility of evidence, much less the admissibility of evidence under state law. The Supreme Court did say in that case that really all you're doing is showing that you're not unlike a previous device that's been on the market, and there's no adjudicative determination that this previous device was a safe device. Let me say two things about that. The first is, that's not what happens now. Bear in mind that in 1990, Congress adopted the SDMA, and although it was on the books when law was decided, the device in law was a pre-1976 device that indeed never went through any kind of 510K process. But let me read to the Court, if I might, from page 634 of the Joint Appendix, because this is the way the FDA, in its guidance document for FDA staff and industry, describes the 510K process. Because devices are classified according to the level of regulatory control necessary to provide a reasonable assurance of safety and effectiveness, classification of a new device through the 510K process requires FDA to determine the issues of safety and effectiveness presented by the new device and the regulatory controls necessary to address those issues. After 1990, the FDA regulations changed, and the 510K process went from being what was initially conceived of as an interim process under the MDA to the process by which more than 90% of all medical devices on the market are cleared by the FDA to be lawfully marketed. Well, not to take you off your argument, but if you had submitted in the 510K process a study from some group of university scientists that verified the safety of this new device, you would have been permitted to introduce that into evidence. Judge, I'm not entirely sure, because the process under the code, under the CFR, under 878-100, allows the FDA to request clinical studies. And the FDA specifically found at Joint Appendix page 936 that no clinical studies were required. No clinical studies were required to approve this product. And if I might read to the Court again from page 951 of the Joint Appendix, which is the FDA's penultimate finding before we were granted permission to market this device, the subject device's components, the polypropylene mesh and the collagen, have been adequately assessed via biocompatibility determinations for safety and via physical strength and characterization assessments for prediction of effectiveness. The product is substantially equivalent with respect to predicate surgical meshes for safety and effectiveness. And at page 934 of the Joint Appendix, which is the final letter from the FDA to BARD, the FDA said, the FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus permits your device to proceed to market. This is the only regulation by which we could have sought lawfully to market our device. And Georgia law is very clear, and there's no dispute from the other side. Compliance with a safety regulation, a safety regulation, is part of the risk utility analysis, is indeed a significant piece, I believe the Georgia Supreme Court said, of the evidentiary puzzle. The FDA 510K process, regardless of the criticism, and there's criticism in the scientific community, and we acknowledge that, and there's been some recent criticism. Mr. Kirchherr, isn't that the problem here, that what would have inevitably happened in this case, and the plaintiffs made this very clear, that there was going to be a fight about the efficacy and accuracy of this whole analysis by the FDA, and essentially the parties were going to be bogged down on litigating the issue of the 510K compliance and would have moved further away from the issues with respect to the case itself. And isn't that a quintessential 403 balance that is within the trial judge's discretion, or are you saying that as a matter of law there is rule 403 has no role to play when it comes to 510K clearance? I don't think we need to go so far as to say it has no role to play, and I meant to get to this earlier and I apologize. When the district court excluded the R510K evidence, the court ruled that our motions in limine to restrict the plaintiff's response to R510K evidence were moot. So the district court never resolved what the trial would look like if this evidence came in. On remand... When you say 510K evidence, do you mean correspondence and whatnot from the FDA? You can lawfully market this product. We never got to the point of a specific evidentiary profit because the court ruled nothing could come in. Right. But what we believe... That's what you wanted to get in. We are entitled to prove that we went through the FDA process and the 510K process. We did everything the FDA asked us to do. The FDA cleared our product to be marketed, and we satisfied all requirements to have this product on the market, period. They are more than entitled to a jury instruction because Georgia law is this doesn't preempt, this doesn't insulate us, this doesn't immunize us. But it is a critical piece of the evidentiary puzzle under Georgia law. And if rule 403 balancing means that if the plaintiff says we're going to fight you and we're going to try to prove that this process is not about safety and effectiveness, the result would be, I'd submit, is that the FDA would be on trial in dozens of medical device cases around the country on a rule that was adopted and approved and remained unchallenged. There's a process for challenging FDA rules. There's a process for initiating rulemaking. But the question for the court is, is it a safety regulation? You're not arguing on 510K evidence. I think I've asked this before. You're not arguing that we were submitting to the FDA these three studies that proved safety, and we were not allowed to put those into evidence. You're only arguing that we weren't allowed to put in the affirmation from the FDA. Yes, because look, Judge, how the trial played out. The plaintiffs went after us hammer and tongs for not doing additional studies, and this brings in the MSDS as well, for not doing anything after we saw the MSDS, for essentially ignoring warning signs and marketing some unsafe product. And the best answer to that, of course, is we were marketing. We made the decisions we made because, bear in mind, under Georgia law, all of this comes in. Safety regulations come in to show the reasonableness of our choice, the reasonableness of our choice. And I ask the rhetorical question, is it unreasonable for a manufacturer that has gone through the only process by which the product can lawfully be marketed to believe that the product can lawfully be marketed in its current form? The fair fight at a trial like this would have been for the plaintiffs to do everything that they tried to do and for us to use this as a piece of the answer, and a critical piece of the answer. Because just focusing, for example, on clinical trials, which is a major point in the plaintiffs' case, that you didn't do human clinical trials. The FDA said you don't have to. How unreasonable is it for a manufacturer that's told by the FDA, which has the power to compel clinical trials, to say I'm not going to do clinical trials because this finished product, again, going back to the MSDS, because that's a critical piece of this as well, as opposed to complaints about the raw materials, this finished product was deemed reasonably safe and effective by the FDA after being compared to predicate devices. One more piece of the puzzle, Judge Diaz, and I meant to get to this as well. The device in law was a pre-1976 device, and although the same evidentiary rules would apply, perhaps there there might be a more appropriate place for Rule 403 balancing, because that pre-1976 product went through no evaluation. As we point out in our reply brief, MeSH went through 10 years, 10 years of analysis by the FDA before it was declared by regulation a Class II device subject only to the 510K process. And we compared our two predicate devices were both devices that had been cleared by the FDA under that regulation. So it's entirely probative, highly probative, and the only prejudice that the plaintiff can claim is, well, that might unduly influence the jury. Well, wouldn't that always be the case? Of course it would. But the district court's 403 balancing means in every case it's going to be so influential to a jury that it can't come in, because that's all the court had before it. And if I could turn briefly to the MSDS point, because the MSDS has a significant role to play in how this all played out at trial with the exclusion of the 510K. The MSDS's rank here say there's no legitimate argument from the other side in their brief as to how this warning slapped on a product by a manufacturer with no scientific evidence, no explanation of how it came to be, no testimony from an expert witness as to its reliability can come in as hearsay. But the prejudice from the introduction of the MSDS was that once the plaintiff kept out the 510K evidence that the product was lawfully on the market and was allowed to present this unverified warning of don't use this raw material in a human being as the key point in their case, and once the plaintiff was successful in defeating the jury instruction we requested, which is that there has to be an instruction to the jury under Georgia law that there must be expert testimony to support a product liability claim at trial on design defect. The plaintiff was able to tell the jury at page 6537 through 6538 of the joint appendix, all you need is the MSDS. All you need to know is that BARD was warned about this product and continued to use it. You don't have to resolve the conflict in the expert testimony. You can return a verdict against BARD, and you can award punitive damages against BARD based solely on the MSDS. Was it that explicit? It was absolutely that explicit. Let me refer the court to page 6537 of the transcript when plaintiff's counsel argued to the jury that the MSDS is, quote, emblazoned in your memories. I bet it was. By the way, it was used at trial. Emblazoned in your memories. Do not use this material in medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues. The interesting thing about this is, quote, you can dismiss all the experts. You can dismiss all the experts. You can say, well, this expert is biased, and that expert is biased, but, Phillips, they don't have a dog in this hunt. They have the material, and this is what BARD brought in, and then concluded the argument at page 6555. Don't send a message in the community that says it's okay. It's okay not to heed the warnings. It's okay not to tell about the MSDS. This was the centerpiece of the plaintiff's case. What was the best answer to the MSDS, even if it was admissible? We were marketing the product lawfully pursuant to FDA clearance, and with the jury not being told that expert testimony is required, it all came full circle to the initial ruling, and there was no way the jury could have fairly determined our liability or the damages. I see my time has expired. Thank you. Before you go. Yes, sir. Take one minute. Make your argument on the constitutionality of the punitives. Judge, if I might defer, we've deferred that to the Georgia Attorney General. He's going to do that. I'm sorry. You mean the award against us? Yes. Well, the first piece of that, of course, is that the MSDS was the key to the punitive damages award. I don't even know how we can begin to do a ratio analysis when under Georgia law, under established Georgia law, regardless of liability, our compliance with the safety regulation is a key element in punitive damages. How can a party engage in willful misconduct, in egregious misconduct, when the party has complied with the safety regulation? So that it was seven times the compensatory, relatively small compensatory award, at least according to what the plaintiffs seem to want, of $250,000, is not hard to understand. Regardless of what the jury believed the non-economic damages were, to the plaintiff, the jury was repeatedly told that we were essentially, as I said, running a rogue operation and disregarding warnings in marketing this product and implanting it in human beings. Of course, the evidence of trial was that every physician who does hands-on work in this field uses polypropylene mesh, and plaintiffs never proved that there was any basis for that warning. So that's the first piece, Your Honor, of the puzzle on the punitive awards, is it was skewed in the first instance. But secondly, it's seven times the punitive damages. It's seven times the punitive damages and could only have resulted from the jury being unduly influenced by the way the case was tried. Thank you. Thank you. Thank you. Ms. Jacobs? Thank you. Good morning. May it please the Court, I'm Julie Jacobs. I'm with the Georgia Attorney General's Office, and I'm here on behalf of Attorney General Samuel Owens, an intervener in this case. I'm here for the limited purpose of addressing the constitutional challenge to our statute, which allows for split recovery and punitive damage actions. I'm also here to urge this Court to affirm the District Court's decision on the constitutionality of our statute. The Georgia General Assembly, as part of the Tort Reform Act of 1987, created this new provision, which allows for 75 percent of punitive damage awards minus attorney's fees and litigation costs to go to the state's treasury. The statute limits the award of punitive damages to only one award of punitive damages per defendant for each act of omission, and there's no limit on the amount of the punitive damage award in product liability actions. The goal and intention of this statute is clear on the face of the statute itself. Subsection A provides that the purpose is to penalize, punish, and deter a defendant. Subsection C says punitive damages shall, quote, be awarded not as compensation to plaintiff, but solely to punish, penalize, and deter a defendant. The statute is crystal clear on its face. These damages are not intended to compensate the plaintiff. The Georgia Supreme Court also has spoken on this issue in Ford v. Unaroyal-Goodrich-Tyre and Mack-Trucks v. Conkle. The Georgia Supreme Court said, quote, the point of the statute is to benefit all Georgia citizens who risk suffering harm from the Defendant's Act and to punish and deter the defendant. The purpose is not to compensate the plaintiff or to create a windfall. The plaintiffs have challenged our statute under the Takings Clause of the Fifth Amendment. But the district court here properly rejected the plaintiff's argument, finding that the plaintiffs have no property right in an award of punitive damages. The Takings Clause prohibits the government from taking private property without just compensation. However, the Fifth Amendment does not create a property interest. Rather, it protects existing interests. As the district court properly held, the first threshold issue that the court must look to is whether the plaintiffs have a constitutionally protected property interest in the damages. To determine whether such a right exists, the court must look to state law. And here the highest court in our state, the Georgia Supreme Court, has held in Mack-Trucks and in State v. Mosley that the plaintiffs do not have a property interest in punitive damages awards under this statute. And the plaintiffs here can't overcome this threshold issue. The state quite simply cannot confiscate a property right that does not exist on the front end. The only support that the plaintiff offers for their position is a district court case, which came out before the Georgia Supreme Court case, McBride v. General Motors Court. And in that case, even in McBride, the district court stated that they carefully considered the briefs in an effort to perceive how the Georgia Supreme Court would rule with regard to the state constitutional questions presented. Counsel, if the plaintiff received punitive damages, and subsequent to that the defendant filed bankruptcy in the United States Bankruptcy Court, would the plaintiff have a right to bring a proof of claim and litigate against a discharge? Your Honor, that's an interesting question. I think they... You said they have no property right. Would they have the right to bring a proof of claim and litigate a 523 action in terms of discharge? I think that they would probably have a right to file a proof of claim, but I think it's possible the state would also have a right to file a proof of claim. I don't think that necessarily means you have a property interest in punitive damages because you have no right to punitive damages. As the courts have ruled, punitive damages are very speculative, whereas the compensatory damages are meant to compensate, punitives are meant to punish. I think at most they might be entitled to 25%, although I would dispute that they do have a property interest. But for bankruptcy court, I don't know that you would really have to have a property interest to necessarily file a proof of claim in a bankruptcy matter. In MacTrucks, the Georgia Supreme Court looked at this issue and said that it did not violate the takings clause. They recognize there's no property right, and they also recognize the stated intent of the statute, which is to punish and deter. The plaintiffs in their brief have ignored the overwhelming authority in the nation, not just in the Georgia Supreme Court, but throughout the nation, numerous states, Alaska, Indiana, Oregon, Missouri, Iowa, North Carolina, have all looked at their statutes, which allow for this split recovery structure, and have all found those to meet constitutional standards. I have a question, Ms. Jacobs. What if you had an action in Georgia state court, and somehow they have in person jurisdiction for the product's liability, but the product itself cannot be sold in Georgia, and they get a judgment for punitive damages. Does Georgia have an interest in that? Because you said it was for the protection of consumers in Georgia. And the product cannot... The product can't be sold in Georgia. I mean, if the product can't be sold in Georgia, I'm not sure how they would get jurisdiction. In person jurisdiction. It may be, very well. They may have an office, some significant presence in Georgia, apart from the product itself, that allowed in person jurisdiction. I think that would be a unique issue. I think a plaintiff in that case would certainly have a better argument. Unfortunately, the plaintiff in this case, I think 10,000 of the plaintiffs that have had this mesh, come from the state of Georgia. The product certainly in this case was sold in the state of Georgia, and all Georgia citizens were subjected to that harm. So in this case, there's no way around it. But maybe then, as applied here, but maybe it's basically improper because it's being overbought. I'm sorry, I don't understand the question. Never mind. Go ahead. There is one circuit court case that has looked at this issue. Inquist v. Oregon Department of Agriculture. They looked at the split recovery statute in Oregon, which is very similar to ours, and also found in that case consistent with Mack Trucks, that the plaintiff's interest in a punitive damage award is not a property right, cognizable under the takings clause, because punitive damages awarded are necessarily contingent and discretionary. They distinguish between compensatory damages, which are mandatory once liability is found, and punitive damages, which are never guaranteed as a matter of right, no matter how egregious the conduct. And again, pointed out that punitive damages are highly speculative. The Inquist holding is consistent with Mack Trucks, as well as other Supreme Court cases throughout, Georgia State Supreme Court cases. I want to point out one more state court case, which came out of the Florida Supreme Court, Gordon v. State. What makes that case significant is that there was a petition for cert filed to the U.S. Supreme Court, and it was denied. In that case, they rejected the argument that its statute, which allocated 60% of punitive damages to the state, was unconstitutional. In addition to that, they actually mentioned the McBride case, which the plaintiff relies upon, and said they, quote, found it completely unpersuasive. The plaintiff does attempt to argue here that when the Georgia General Assembly enacted this statute in and of itself, particularly Subpart B, which provides generally for punitive damages, and states that punitive must be proved by clear and convincing evidence, they seem to argue that that enactment in and of itself creates a property right. And even if we accept the plaintiff's assertions as true, they would still only be entitled to a maximum of 25%, because the statute in and of itself notifies the plaintiff on the front end that they're entitled to 25%. It eliminates any expectation of any recovery beyond that. The district court case correctly recognized Georgia's statute, grants the state an interest in the award, and that the plaintiffs have no property right. And unless there are any questions, I'll sit down. Thank you. Thank you, Your Honor. Thank you, Your Honor. May it please the Court. My name is Anthony Magistro, and I represent Donna and Dan Sisson, who asked this court to affirm the judgment that was rendered in their favor and reject the challenges to the evidentiary rulings by Bard, which were not an abuse of discretion. Initially, I think I want to start with where they spent most of their time on the FDA question. And I have two introductory points. The first point is the argument Bard wanted to make to the jury, that somehow or another this 510K approval was something significant. Under the relevant FDA statutes, they are not permitted to make that argument in the marketing of their products. At 21 CFR 807.97, which we cited in our brief, page 56, the regulation makes clear that marketing that even creates the impression that 510K determinations of substantial equivalence denote official approval of the device, or that FDA has declared those statements misleading. And if Bard would have used that to try to sell these drugs, to get doctors to prescribe them or patients to ask their doctors for them, they would be guilty of illegal misbranding. So what Bard wants you to allow is you to allow them to make that same statement to a jury that they can't make to a trained doctor. Well, but if Georgia law allows them to make that statement, I mean, that's different than a marketing campaign. Well, the point is the FDA itself says those statements are misleading. The FDA doesn't preempt Georgia law on this issue, does it? It does not. And I think that gets a good segue into my second point, and that is in looking at this issue of regulatory compliance, the issue, the question you should ask is, regulatory compliance with what kind of regulation? Bard argues that any kind of safety regulation is somehow relevant under Georgia law, and that's not the law. And I think I want to start on that point with not a Georgia case, but this Court's opinion in Talley v. Danick Medical. In Talley, this Court distinguished between regulations that have specific substantive requirements that a device be safe and effective and regulations that are administrative requirements that may relate to safety but don't impose those specific requirements. And what this Court found was because those kinds of regulations, like 510K, lack any independent substantive conduct, they don't impose a standard of care. Now, this Court's decision, we believe, is consistent with what Georgia law is. And we haven't had any discussion of Georgia law, and I'd like to take some time to explain why we think Georgia law requires a whole lot more than Bard's arguing to this Court. Well, would you agree, though, that the 510 regulation and entities' compliance with that has some probative value, but you would say it's just not very much? I think the District Court was correct in determining on the facts of this case and the record made below that it really had no probative value. The determination was that this product is similar to another product that was marketed, that it was similar to another product. And contrary to Bard's argument, there was no premarket approval. This is not a case where somebody went and got premarket approval for a product, and then that product and then this product, this Avalta Plus, was determined to be substantially equivalent to a product that the FDA went through full Class III premarket approval. This is a case where you go back from this Avalta gynecological mesh to regular surgical mesh to other mesh products to way back to products that started in the 50s and 60s. There never was the formal premarket approval testing that was happening. So we would say that determination that this product is like another product that was like another product really in the context of this case, and I think it's important to listen to what the Georgia law requires, was irrelevant. And at the very least, whatever relevance it is, it's so minimal that the district court correctly found on this record that 403 would have been violated by allowing it in. Would the degree of relevance be the same for actual damages as opposed to punitive damages? Yes. Why?  You have a completely different standard for punitive damages. You do, but again, my question, regulatory compliance with what? Would BARD be allowed to introduce into evidence that all of their trucks had driver's license? That's regulatory compliance. Or for that matter, let's go a little closer to safety, that their factories met the FDA's requirements for cleanliness. That's a safety requirement. To be relevant, the requirements and standards have to be the kind of standards that are relevant to the alleged defect, to the claim that the plaintiff's bringing, not to some other thing, yeah, we're good people and we comply with the law. I mean, I think the jury, contrary to what BARD's arguing, I think the jury likely assumed that the product was on the market legally because nobody told them it wasn't. But I really want to get to Georgia law on this because I think it's important to understand. The cases BARD cites about Georgia requirements all deal with specific performance standards like this court addressed in tally. For example, Doyle and Gentry were FMVSS 208 airbags, passive restraint seat belt cases where the National Highway Traffic Safety Administration has very specific performance standards on what those devices have to have. Welch v. GM was another FMVSS case regarding brake light design. But I think what's important is to look at what the Georgia Supreme Court said in Doyle. Doyle based the conclusion that this regulatory evidence was admissible on the restatement third. The explicit citation to the restatement third, which the defendants cite as an argument for why regulatory compliance is important. But I think it's important to drill down and understand what the restatement we're talking about. Under the restatement section four, a product's compliance with an applicable safety statute is properly considered in determining whether the product is defective with respect to the risk sought to be reduced by the statute of regulation. Now the comments to this section make it abundantly clear that it's something more than some general standard that is relevant to safety. Comment A says, a safety statute or administrative regulation, the ones they're talking about are ones that establish binding safety standards for the design and marketing of the products. Comment C says, for the purpose of this section, the safety statute or administrative regulation must be such that compliance reduces the risk that caused the plaintiff's harm. So they give an example of whether a vehicle is stable enough and tipping over. They don't say you're allowed to introduce evidence that your seatbelts were okay. What would be relevant in that case would be compliance with regulations that reduce the risk of harm from the product being tipped over. The 410K evidence here doesn't reduce the risk of the harms that would cause the plaintiff. And as such, under the Georgia law, we're not relevant in the case. Now we cite a bunch of different kinds of cases where the courts have looked at 510K and said it isn't about safety, it's about substantial equivalence. We have the preemption cases, which we discuss excessively a lot in our briefs. We have the cases where plaintiffs sought to introduce evidence where the FDA denied 510K clearance and the device was marketed under general. And the courts denied the use of that evidence in a plaintiff's case. And we also have TALI, which was the Medicaid reimbursement case. All of those cases, the defendants want to say those are irrelevant, those are something else. But all of those cases bear one legal conclusion in common. And that's these cases, and they go for decades, pre and post the enactment in 1990 of the Safe Medical Devices Amendment, and they say, and they're all based on this conclusion, that the 510K substantial equivalent clearance is not a safety regulation. And so you take that conclusion and you apply it in the context of Georgia law, like the district court did in this case, you come to the conclusion that they didn't say the mesh had to be made out of a certain product. They didn't say the mesh had to have performance standards. In fact, let's talk about their last argument they raised in their reply brief, about how the FDA classified these devices as Class II and did this 10 years of studying. Well, first of all, Bard argues that the FDA concluded that the panel found there was generally accepted satisfactory levels of tissue compatibility. That's not what the panel found. The panel actually recommended establishing a performance standard for surgical mesh and said that the materials used should meet a generally accepted satisfactory level of tissue compatibility. They didn't say they have met it. They said we need to establish a performance standard to assure they met it, and that's why they made them Class II. There has never been, there never was, and there's never been an adoption by the FDA of any performance standards that apply to surgical mesh in general, or pelvic mesh in particular, or this Evolta Plus product that injured the plaintiff. Well, Steve, I guess you're highlighting the problem that the district court faced in this case. You're talking about this 10-year period of approvals or not. You're discussing these specific tests that may or may not have resulted in a finding of some level of safety, but the problem is that the jury would have had to redirect its attention to this particular analysis and determine for itself exactly what these regulations meant, and it seems to me that the district court decided that it just wasn't worth the effort. Well, and let me read you what I think is the best argument that supports that position. The risk of unfair prejudice is particularly acute in these cases because the FDA takes such actions based on considerations that are foreign to most lay jurors and that are distinct from the applicable liability standards that govern plaintiff's state tort law claims. Although jurors unfamiliar with FDA procedures might easily misinterpret the nature of such actions, actions by regulatory agencies like the FDA undoubtedly carry great weight in the jury's mind, and there's a serious risk that the jury will incorrectly perceive certain of the FDA's action as conclusive evidence. I didn't say that. We didn't say that. The district court didn't say that. That was Bard's argument in opposition to the FDA evidence we wanted to put in. We believe they were right, and the district court correctly found that they were right on 403 for that issue. And the argument that, well, if you accept this argument, you would have 403 in any case, I think that's an exaggeration of the record in this case. This is not a case where someone generically said 510K is bad. This is a case where the district court recognized and made specific findings that there was another side to the FDA's approval of these particular classes of devices. So whether or not a pain pump case that's cleared under 510K, that evidence would be inadmissible in that particular case, that's not a decision this court has to make. What this court has before it is a factual finding by the district court who had before it the record of both sides and sought to avoid precisely the problems that Bard worried about. In fact, in that quote continued, Bard said, in order to counter this inference, Bard would need to present evidence further explaining its business decision to discontinue the product, and the entire focus of the trial would be diverted to litigating this irrelevant issue. If I was just a minute on, you told us a lot about what 510K isn't, but you can see it's something, right? Well, 510K, what happened is that the No, I don't want you to give me what happened, but it is something. It's a determination by the FDA that the product is substantially equivalent to a product that is legally on the market. Right. What it is, it's a comparative. Exactly. It's solely a comparative, and it's based on identification, not performance, you would say. Yes. Right. It's the same materials. It's the same thing that all, it's identified with something that's already on the market. As you say, it goes back three decades. And particularly in cases like this, it's the same as products that have never been specifically approved to be on the market. When the Medical Device Act was passed, everything that was already being sold was grandfathered in. So, mesh, pelvic mesh, or abdominal mesh was being used, so therefore that then polypropylene was being used, along with a number of other materials. So the FDA said, well, you can continue to use them. These manufacturers came up with new products, new devices. The FDA said it's the same as those other products, which have never been studied and particularly approved by the FDA under the rigorous premarket approval. So that's why, yes, it's something, but it's not a specific safety regulation that says you need to make your pelvic mesh this way with this size pores without these arms that cause other problems and without this pig collagen that causes adverse tissue reactions. Mr. Magistro, so the FDA doesn't get the opportunity to tell the jury that the product is safe. Okay, so what's the basis for allowing a supplier of the raw material to tell a jury that the product is not safe? Well, it's the MSDS argument. Let's be really specific about, first of all, what the statement says. The statement doesn't say the material is unsafe. What the statement says... It all but says that. It says, do not use this material in medical applications involving permanent implantation in the human body or permanent contact with internal bodily fluids and tissues. What do you think that tells the jury? That tells the jury that the manufacturer doesn't believe that this product is appropriate for that use. It's not safe for that use. It's not appropriate for that use. What's the foundation for allowing that evidence to come in? Okay, well, first of all, I think the district court was correct in determining that in its pretrial rulings it said that it could come in to show that the statements contained were made, that the defendant had knowledge of those statements, and their effect on the barred conduct and the conduct of others. But the problem with that is that the use of the statement went far beyond that. I mean, I heard the closing argument of the plaintiffs in this case. That went far beyond using the statement for some other purpose than its truth. It went precisely to tell a jury that you should ignore the expert testimony. Here's the only thing you need to rely on. I'm troubled by that. Well, and that might have been a whole lot better argument if that statement had been objected to in closing. It was not, which gets to the next argument that we have on the MSDS, and that is the judge made really four rulings on the motion in limine. It said it could come in if it's not hearsay. It can come in under 803.17, and it can come in under 803.18, and it can come in as a residual. Then the judge – What do you say here? What? You say it's hearsay or not hearsay under an exemption? Well, the problem is that what the judge also said in that very same ruling is to the extent things can come in for some purposes and not another, it's incumbent upon the parties to object at trial. In this case, the first two times MSDS comes in, they come in through the plaintiff. We asked whether she knew about that and she would have the product implanted, and she said no, no objection. Comes in through the plaintiff's implanting physician, same question. Would you have implanted if you had known that? He said no. Then the next time, then the statements get introduced by the defendant with their witness. The statements also get introduced by the plaintiff in cross-examination. Well, by that time, the cat's out of the bag. What are they supposed to do, just sit there and do nothing? Okay, well – With respect to the objections, is it incumbent upon the defendant to object once it has made its objections on the motion in limine and the judge has indicated it comes in not only for not hearsay purposes, but it's admissible under an exception? Well, the exceptions have requirements that have to be made. What they're arguing in their briefs here is that we didn't meet those requirements. It was incumbent – and what the rules say on motions in limine is that when there's a conditional ruling, it's incumbent upon the party to clarify any – the party objecting to clarify any doubt. And what's important, too, is nowhere in this record did Bart ever ask for a limiting instruction or an instruction that did not say, object, why is this coming in, attempting to clarify, given the district court's multiple grounds saying where it could come in, and given the district court's explicit warning to the parties that you need to object to clarify why it's coming in. For example, if it's error to put in under the expert exception without having the expert testify that they relied upon it, that's an objection Bart needs to make at the time the expert testifies. They can't just wait until their appellate briefs to make those arguments. And, you know, in terms of – and then finally, I think the – taking the closing out of – if we determined that it was hearsay, is your basic argument that there's waiver with regard to the hearsay exceptions that would have allowed the evidence to come in? That's probably the third argument. Second argument is – first argument is not hearsay. The second argument is that it comes within the exceptions. And to the extent that there is – that the record doesn't establish that that comes within the exceptions, it's because Bart didn't do its job in making the proper objections. All right. If we conclude that it is hearsay, what's your best hearsay exception for this? Well, we – I mean, and I want to point out on the record, we did not argue that it met the exceptions. That was – the judge gave us that without us. All right. And our point – our point was it's not for the – What's your best one? I think 803.17 and 18 are probably a tie. The – you know, the – with respect to 17, it went in through their expert witness. And that – and so that – and it's very clear that if you look at an MSDS, it is a – it is a compilation that's generally used and relied upon by the public and persons in particular occupations. MSDS sheets are relied upon by manufacturers such as Bart. There was evidence in the record of that. And we think that it fits within that 803.17 compilation. I think that's probably – that's probably – I would say that's the best. Different – different topic. In this case, the jury came back with a verdict on liability. Yes. Right? Initially. And then there was a separate proceeding for damages. Yes. In that context, was there any request or argument to bifurcate the damages proceeding into an actual damages versus – and then later a punitive damages proceeding? Or was it all done at one time? What happened is the jury came back with a compensatory damage verdict and judgment as to amount. The court took a break. The plaintiffs put on evidence of Bart's worth for purposes of punitives. The parties closed with respect to punitives. And then the jury came back with a word of punitive damages. Did the – did Bart argue at that point, after the compensatory verdict came back, and obviously Mr. Shurker can talk about this, did they argue that the 510K evidence should come in at that point with regard to the punitives? I believe so. The judge rejected it for the same reasons I've argued. All right. All right. You know, and with respect to the MSDS, that was not the plaintiff's entire case. And with respect to – as the district court pointed out, there was significant evidence that Bart was aware of the problems. There was significant evidence and did nothing. There was significant evidence that Bart's – both internally and externally, people requested that additional studies being done. There was significant evidence of the limited animal studies that were done that turned out badly. All of that – and then with respect to causation, Bart's own lawyers agreed there was sufficient evidence of causation for some of the alleged defects to go to the jury. And it's important under Georgia law – under Georgia law, we don't have to prove each defect and causation, just that the product as a whole is unreasonably unsafe. I'd like to also touch on – since you asked Judge Agee about punitives, I'd like to touch on the punitive damage question. I think the important point on punitive damages in this case is that Bart has conceded reprehensibility. They don't argue their conduct wasn't reprehensible. Not only the MSDS, we have the failure to remedy the defect, the failure to test, and the dismissal of the bad tests they had. All of that the district court found added to reprehensibility. In addition, what we have here is under the applicable test, you've got to balance reprehensibility with the amount of punitive damages compared to compensatory damages. It's not – there's no case that I'm aware of that has been cited that says that a ratio alone, maybe if you had a ratio high enough, a ratio alone would be enough to overturn a punitive damage case. But this is a single-digit multiplier in a compensatory damage award compared to other compensatory damage awards is not unreasonably high. And so multiplying a seven-times multiplier is consistent with a number of verdicts. In fact, in Campbell, when the U.S. Supreme Court remanded State Farm v. Campbell, the court entered a punitive damage award at a nine-to-one ratio, and then cert was denied. So we believe that on the – how reprehensible all this is, the facts of that are such that the punitive damage award was justified under the facts of this case. Finally, I want to talk a little bit about the Georgia statute in the little time I have left. First of all, I think it's important to note that one of the concerns about punitive damages is that the defendants will continue to be exposed to numbers of punitive damage awards. In this case, if the Georgia statute – the other provision of the Georgia statute is upheld, this is going to be the only punitive damage award that barred will suffer under Georgia law for this product. So that concern is what we think has a higher multiplier. Secondly, with respect to the Georgia statute, when we did time, I was under the impression I was going to get a rebuttal. And I saved five minutes, and I think – I don't know if we went in the – Your impression is correct. Okay. So I deal with the – can I deal with the Georgia statute then? Okay. So again, unless the court has any other questions, we believe that Judge Goodwin very carefully ruled on these discretionary rulings that were correct, and we believe that the judgment for Mr. and Mrs. Sisson should be affirmed. I understand the opposing counsel's argument to the part that – waived objections. I assume you want to tell us why that's not true. Yes, Your Honor. I'd be pleased to. I refer the court to pages 23 through 25 of our reply brief where we address the surprising preservation argument. I say surprising because the district court's in limiting orders showed that the district court knew the difference between saying, we'll see how this plays out at trial, and a definitive ruling. And I prefer the court to the joint appendix at 1162 through 63, which are definitive rulings by the district court that the MSDS is admissible for its truth under three hearsay exceptions. It is true. My opponent did not seek that. But my opponent grabbed it and ran with it throughout the trial. It came in when Dr. Rabin, the first witness, testified. They presented the MSDS to Dr. Rabin, the initial treating physician for Mrs. Sisson. Did you know about this? Would you have done this surgery, which you've done thousands and thousands and thousands of times in consultation with Barbara, would you have done this surgery if you had seen the MSDS? No, I wouldn't have done that. We objected. The objection was again overruled. They then presented it to Mrs. Sisson during her testimony to elicit very prejudicial testimony from her about how she felt about the MSDS. And then they used it in the cross-examination and direct examination of our Vice President for Research and Development, Mr. Leroy, and that's where actually the prejudice crystallizes, so I'm surprised to hear them argue it. Yes, once the MSDS was there and Judge Diaz the cat was well out of the bag, Mr. Leroy testified that we had been buying from this company for years and years and years. It had not been on the MSDS. We had not seen it on the MSDS until after the manufacture of the Evolta Plus in 2007. It was the first time we saw it. And when he tried to answer the question, why didn't you do something about it, he explained a number of things about Bard's internal procedures and then said, and we complied with worldwide regulations, at which point the district court jumped in without an objection from the other side, warned Bard that it would have what he called a mess here if the testimony continued, and Mr. Leroy was instructed not to make any mention of 510K clearance in explaining why Bard had continued with the same manufacture of the product. We raised the issue again in our motion for due trial. Interestingly, our opponents made no objection to the district court that the issue was not preserved, and the district court addressed the issue on the merits in the new trial motion. As to the closing argument, this is the first time I've heard, because it doesn't appear in the briefs, that we should have objected after testimony that was ruled admissible several times by the district court was presented, after the district court instructed our witness not to respond to that testimony with the most powerful response, but after the district court rejected our request for an instruction to the jury that the plaintiff was required to present expert testimony, that we should have objected when the plaintiff took advantage of those rulings and made the argument that it made under the rules established by the district court. There's no requirement that we do that. It shows the prejudice. It wasn't an improper argument outside the evidence. It was an argument very much based on the evidence, but the evidence should not have been there. And then the district court denied our motion for due trial. I don't know what else could be expected of us to preserve the issue for appeal. But let's talk for just a minute about Georgia law, because I don't think it was accurately portrayed. So if I might read the Georgia Supreme Court's Doyle decision. Under the risk utility test, compliance with federal standards or regulations, standards or regulations, is a factor for the jury to consider in deciding the question of reasonableness, that is whether the product design selected was a reasonable one from among the feasible choices of which the manufacturer was aware or should have been aware. That is Georgia law. The FDA, Judge Gregory, is indeed something. It is the process by which more than 90% of medical devices are cleared for marketing in the United States. It is what the FDA now describes, if I might, at page 716 of the joint appendix, as a multifaceted premarket review process that is expected to assure that cleared devices, subject to general and applicable special controls, provide reasonable assurance of safety and effectiveness, reasonable assurance of safety and effectiveness, and to facilitate innovation in the medical device industry. And at page 638, although the 510K process involves a comparison of a new device to a predicate device, rather than an independent demonstration for a PMA, in both cases, FDA's review decision reflects a determination of the level of control necessary to provide a reasonable assurance of safety and effectiveness. This is a safety regulation with which we complied, and the only regulation by which we could have sought to bring this product to market. And that's what we wanted to prove to the jury in compliance with Georgia law. Final point, the jury was instructed in accordance with Georgia law, that is the jury was told that one of the factors you are to consider is whether the product complies with safety regulations. The jury heard nothing about safety regulations at trial. I thought there was some evidence of other safety regulations, not necessarily this one, but some other evidence that justified the instruction. The district court excluded an opening statement. I refer the court to the opening statement when we began to get into other FDA regulations, because that indeed had been left open in the district court's ruling. The district court's words were to the effect of, I'll make this easy for you. Nothing comes in about the FDA. So the jury doesn't hear anything about how this product got to market, why we were selling this product. All they hear is that we were using an unauthorized material to create our product. And when we don't defend ourselves by showing that it's lawfully on the market, what reasonable conclusion can be drawn by a juror who didn't hear anything about safety regulations? The distinct possibility, the frightening possibility, exists that this jury believed we were not lawfully marketing this product, when in truth and actuality we were in compliance with the safety regulation and we should have been allowed to tell the jury that. Thank you. Thank you. With respect to the cross appeal, I think that it's important to put this case in the procedural posture that's unlike the other cases. It's not a case where someone has a hypothetical amount of a claim that they may or may not get. This is a case where my clients now have an actual judgment. The property rights, the judgment says Donna and Dan Sisson shall recover $1,750,000 from BART. We believe that's enough of a property right to impose the requirements of the constitutional due process and that Georgia can't willy-nilly take that away without providing due process and just compensation under the Fifth Amendment. In addition, we believe that unlike... It's not willy-nilly, it's a statute. The statute, as the court in McBride explained, has no rational basis to explain why product liability plaintiffs ought to be treated any differently than any other plaintiff that's getting a punitive damage award. Because they're consumers and when you have been pointed out to be punished for your action for that product, all Georgians are hurt by that and then they should benefit from damages. They're rewarded not for personal compensation but for punishment, exemplary. That's why they're an example. That's for no reason you're saying this, but it did have a reason. I think Countess Jacobs laid it out. You don't dispute as she gave the legislative history. Well, we believe that that's not a significant distinguishing factor that would prohibit you to treat that group differently as the court in McBride found. But you do agree that it makes sense that many people have consumer products and beyond the plaintiff and, therefore, they're going to be an example. Then all of Georgia should benefit from the largesse of that example, being an example. But you could make that same argument with respect to any other punitive claim. It's not really a car accident. We all drive cars, but we're talking about a single act of a person grossly negligent, running into someone, and it's punitive because the way they were doing it, they were drinking alcohol or whatever. This is different. It was punitive because they made a product that this happened to be the plaintiff who was injured, but all of us, all Georgians, all of us could have been exposed to this, and, therefore, that's why this exemplary largesse should endure to the benefit of all Georgians. I know you don't like that, but that seems to be quite consistent with logic and rationality, doesn't it? Well, that, indeed, is their argument and the state's argument, but we believe that the Georgia District Court in McBride with the first court to look at this got that right. Okay. Really, that's all I have to that. If the court would, you know, Bard's counsel made the argument regarding the jury instruction, which was not his original argument, and if the court would like to hear a response to that, I'd be happy to do that. Go ahead. I think you want to respond. Go ahead. Yeah. I mean, the court in the trial court in this case gave the whole Georgia pattern jury instruction, which also has factors like the appearance and aesthetic attributes of the product. So it was not that the court picked on Bard by putting this regulatory evidence in. More importantly, you know, we can talk about what you have a duty to object to. You do have a duty to object to jury instructions, and this particular jury instruction was not objected to by Bard on this basis. In fact, it was objected to by the plaintiffs, by my counsel sitting at the table with me, on the grounds that there wasn't any evidence of it and the judge's ruling was, we're going to just read the instruction the way it is. Nobody can argue that point one way or another. So their brief and their argument makes a big deal about this instruction, which was really a non-event in the course of this trial and not objected to by Bard. Since you opened the door, counsel, and went beyond that, I want to ask you a question. Sure. Don't you think there's something unfair about the fact that you bring in this statement about you shouldn't use this at all, our product at all, if I were introduced to a human, and then not allow them to have, to not be able to explain that at all, the context of that? Well, they did explain the context of it. There was substantial testimony regarding the context of that statement. What they weren't allowed to do was say that the FDA cleared the product under 510K because that is not a safety standard. What they were allowed to do is explain testimony about how it was a liability issue. There was a whole explanation about that statement in the MSDS that the jury got to hear and resolve themselves. The court didn't just let the plaintiff put the statement in and then not have any other debate about the issue. Thank you so much. Appreciate it very much, Your Honor. Again, we would ask that the judgment be affirmed. Thank you.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz